IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Parental Rights to: | ) | No. 36776-2-III |
| | ) | (consolidated with |
| J.G.A., | ) | No. 36777-1-III |
| A.A.A., | ) | No. 36778-9-III |
| E.R.A., | ) | No. 36779-7-III) |
| A.E.A. | ) | |
| | ) | UNPUBLISHED OPINION |
| | ) | |
| | ) | |

LAWRENCE-BERREY, J. — A mother appeals after the trial court terminated her parental rights to her four youngest children. She raises several arguments that require us to review the record and determine whether various findings are supported by substantial evidence. Because they are, we affirm.

FACTS

At the time of trial, Ms. L.[1] was 31 years old. She has seven biological children. This proceeding relates only to her four youngest children.

_____

[1] We refer to the mother by her last name initial to protect the privacy interests of her children.

Ms. L. has longstanding substance abuse problems involving methamphetamine, alcohol, and marijuana. She began using methamphetamine when she was about 14 years old and has been unable to sustain sobriety despite seven inpatient treatments. When she was 18 years old, her three oldest children were removed from her custody. Eventually, she relinquished her parental rights to her oldest child and agreed to nonparental custody for the other two children.

In July 2016, the Department of Children, Youth and Families (Department) received a referral that Ms. L. had relapsed on methamphetamine a couple of days before giving birth to J.G.A, the youngest of her seven children. The Department investigated and learned that the father of the youngest three children had a history of domestic violence against Ms. L.

In September 2016, Ms. L. stipulated to dependency and out-of-home placement of her four children. The oldest child was placed separately from the three younger children. The court ordered Ms. L. to submit to random urinalysis (UA) tests four times per month and to engage in various services. These services included drug and alcohol evaluation and treatment, a parenting assessment and classes, a domestic violence assessment and classes, and a mental health evaluation and counseling. The Department made referrals to provide Ms. L. with all of the court-ordered services.

2

Clinicians diagnosed Ms. L. with severe stimulant use disorders for amphetamines, cannabis, and alcohol. One provider assessed Ms. L. in October 2016 and recommended a co-occurring treatment program where Ms. L. could receive both chemical dependency services and mental health care. Other providers assessed Ms. L. multiple times and secured for her bed dates for inpatient treatment.

Until May 2018, Ms. L. had little or no follow through on any of the offered services. In addition, a social worker testified that Ms. L. submitted to random UAs only a handful of times, mostly during the two months before the February 2019 dependency trial.

Ms. L. visited her children sporadically during the first two years of her dependency, missing approximately 50 percent of her scheduled visits. Witnesses described the visits as chaotic.

In July 2018, Ms. L. was admitted to Isabella House for inpatient substance abuse treatment. While there, Ms. L. also participated in parenting classes, domestic violence trauma counseling, and mental health treatment. During this time, she exercised consistent visitation. But the children fought with each other, and also fought with Ms. L. The children kicked, screamed, bit, and hit one another. This required the Department to drive the children separately and for two supervisors to attend visitations.

In October 2018, Ms. L. graduated inpatient at Isabella House. Her insurance permitted her to continue living at Isabella House for another two months if she was living there with a child. She asked the Department to allow her children to live with her, but the Department did not approve. Instead, the Department arranged intensive outpatient treatment in addition to other services. Ms. L. arranged to live with an aunt while receiving these services.

Ms. L. lived only briefly with her aunt before family conflict caused her to leave. Ms. L. did not notify the Department she left and soon became homeless. Ms. L. did not attend scheduled services and relapsed.

In December 2018, Ms. L. stayed with her grandmother for a couple days, then lived at the YWCA for 30 days. When the Department learned where she was, it referred her to domestic violence counseling. Her counselor realized Ms. L. did not have sobriety, which affected her ability to participate successfully. Ms. L. later admitted that she had relapsed multiple times with methamphetamine and alcohol after leaving Isabella House.

By December, the Department had concerns about the placement of the three younger children. The concerns included the foster mother sabotaging the younger children's relationship with their mother. In early 2019, various service providers were consulted. They agreed it was best for the younger children to move to a new foster

4

home.  The three were placed in a foster home approved for adoption, and the older child remained in the foster home where he had lived for over two years.

The termination trial began February 11, 2019.  By that time, Ms. L. was participating in, but had not completed, most of her ordered services.  She was participating in intensive outpatient treatment at Sundown M Ranch, but likely needed 6 months of inpatient treatment at the facility, followed by 9 to 12 weeks of intensive outpatient services.  Ms. L. needed 3 more months in her current parenting program and one year of domestic violence counseling, the latter which could not begin until she demonstrated sobriety.

JoAnn Gibson, the social worker assigned to the case, has a Master's Degree in social work and public administration, and had worked for the Department for 17 years. She reviewed Ms. L.'s current parental deficiencies and testified she did not believe Ms. L. could remedy them in the near future.  In her opinion, the near future depended on the age of the child.  It ranged from a few weeks for the six year old to one to two days for the two year old.  She testified that continuing Ms. L.'s relationship with her children would diminish their prospects for early integration into a stable home.  In her opinion, the children had experienced trauma and needed stability and a routine, something Ms. L.

could not provide.  For this reason, she believed termination of Ms. L.'s parental rights was in the children's best interests.

For each of the four children, the trial court concluded the Department had proved the parental termination factors of RCW 13.34.180 by clear, cogent, and convincing evidence, and terminated Ms. L.'s parental rights.

Ms. L. timely appealed.

ANALYSIS

Ms. L. assigns error to several of the trial court's findings of fact and conclusions of law and asserts five specific arguments in support of reversing the trial court.  We first provide an overview of the law and then address her arguments in the order raised.[2]

Parents have a fundamental liberty interest in the care, custody, and companionship of their children.  *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982).  To deprive a parent of this fundamental right is a two-step process.  *In re Welfare of A.B.*, 168 Wn.2d 908, 911, 232 P.3d 1104 (2010).  First, the Department must prove the six termination factors set forth in RCW 13.34.180(1) by

---

[2] Ms. L. assigns error to the trial court's denial of her motion for reconsideration. But because she provides no argument in support of her assignment of error, we do not address it.  RAP 10.3(a)(6); *Scott's Excavating Vancouver, LLC v. Winlock Props., LLC*, 176 Wn. App. 335, 348, 308 P.3d 791 (2013).

6

clear, cogent, and convincing evidence. *Id.* If that is satisfied, the court then determines whether by a preponderance of the evidence, termination is in the best interests of the child. *In re Dependency of K.N.J.*, 171 Wn.2d 568, 576-77, 257 P.3d 522 (2011). We afford the trial court great deference on review. *In re Dependency of K.S.C.*, 137 Wn.2d 918, 925, 976 P.2d 113 (1999).

This court reviews a trial court's decision on any of the six termination factors for substantial evidence. *In re Parental Rights to B.P.*, 186 Wn.2d 292, 313, 376 P.3d 350 (2016). The trial court's findings "must be upheld if supported by substantial evidence from which a rational trier of fact could find the necessary facts by clear, cogent, and convincing evidence." *In re Welfare of M.R.H.*, 145 Wn. App. 10, 24, 188 P.3d 510 (2008). Clear, cogent, and convincing evidence means "highly probable." *Id.*

1.  ALL NECESSARY SERVICES WERE OFFERED OR PROVIDED

Ms. L. argues the Department failed to provide all necessary services when it refused her request for her children to live with her at Isabella House. She argues this failure deprived her of the full benefit of the drug treatment provided her at Isabella House. She additionally argues the Department's negligent foster care placement caused her to be untimely discharged from Isabella House.

Under the fourth termination factor, the Department must provide "all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future." RCW 13.34.180(1)(d). Ms. L. implies the only way the Department could discharge its obligation to provide drug treatment services was to allow her to continue inpatient treatment at Isabella House. We disagree.

First, "[a] service is 'necessary' if it is needed to address a condition that precludes reunification of the parent and child." *In re Parental Rights to I.M.-M.*, 196 Wn. App. 914, 921, 385 P.3d 268 (2016) (citing *In re Welfare of C.S.*, 168 Wn.2d 51, 56 n.3, 225 P.3d 953 (2010)). There is no evidence that continued inpatient treatment at Isabella House was needed to address Ms. L.'s drug dependencies. Ms. L. had graduated from the House's inpatient program, and she was ready for the next step. The Department acted reasonably in transitioning her from inpatient to intensive outpatient treatment.

Second, there is substantial evidence to support the trial court's challenged finding that Ms. L. was not ready for placement of her children at the time. At the time, the children were very challenging. Visits were chaotic, and the children hit, bit, kicked each other, and assaulted Ms. L. Ms. L. was not ready for this chaos. Days after moving in with her aunt, Ms. L. had a falling out with her aunt, which caused her to move out and soon after become homeless. Ms. L.'s inability to live with one adult justifies the

8

Department's decision to not place Ms. L.'s chaotic children with her while she was working on her recovery.

Third, there is no evidence the Department was negligent in *placing* her three youngest children with the foster mother. Once the Department received reports that the foster mother was undermining Ms. L.'s relationship with the children, it promptly investigated and took action. This occurred in December 2018. The children's aggressive behavior predated these reports by several months.

> 2. THERE WAS LITTLE LIKELIHOOD THAT MS. L. COULD REMEDY HER PARENTAL DEFICIENCIES IN THE NEAR FUTURE

Ms. L. contends the trial court erred by finding there was little likelihood that she could remedy her parental deficiencies in the near future. We disagree.

The fifth termination factor requires the Department to establish:

> That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. *A parent's failure to substantially improve parental deficiencies within twelve months following entry of the dispositional order shall give rise to a rebuttable presumption that there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future.*

RCW 13.34.180(1)(e) (emphasis added).

"What constitutes 'near future' depends on the age of the child and the circumstances of the child's placement." *In re Welfare of C.B.*, 134 Wn. App. 942, 954,

9

143 P.3d 846 (2006) (citing *In re Dependency of T.L.G.*, 126 Wn. App. 181, 205, 108 P.3d 156 (2005)). For a younger child, the "near future" is shorter than it is for an older child. *Id.* The circumstances of the child's placement include the length of time the child has been out of the parent's care and the amount of contact the child has had with the parent. *See In re Welfare of Hall*, 99 Wn.2d 842, 847-48, 664 P.2d 1245 (1983); *In re Dependency of T.R.*, 108 Wn. App. 149, 165, 29 P.3d 1275 (2001).

Ms. L. first argues this factor cannot be established when the Department's own conduct reduced the parent's likelihood of success. Her argument is premised on her prior arguments that the Department negligently placed her children with a foster mother who sabotaged her relationship with her children, and the Department should have placed the children with her at Isabella House. We earlier concluded the Department was not negligent in its placement of the three younger children. The Department took appropriate and timely action once it learned the foster mother was sabotaging Ms. L.'s relationship with her children. We also earlier concluded that the record supported the trial court's finding that Ms. L. was not ready to have custody of her children while she was still working on her sobriety.

We note that Ms. L. succeeded at Isabella House. She graduated inpatient treatment and transitioned to intensive outpatient treatment and other outpatient services.

Ms. L. did not succeed with intensive outpatient treatment because she left her aunt's house within days of leaving Isabella House and failed to advise the Department of her whereabouts. Ms. L. then began using methamphetamine and drinking alcohol. Ms. L.'s failure to stay clean was not attributable to the foster mother or the Department's decision not to place her children with her.

Ms. L. also argues the social worker's testimony of "near future" was erroneous as a matter of law. We need not address this and other related arguments. The Department provided or reasonably offered Ms. L. all necessary services likely to remedy her parental deficiencies, yet Ms. L. failed to substantially remedy her deficiencies after two and one-half years. The substantial time and efforts made by the Department aptly support the trial court's finding that the fifth termination factor had been sufficiently proved.

3. CONTINUATION OF THE PARENT-CHILD RELATIONSHIP CLEARLY DIMINISHED THE CHILDREN'S PROSPECTS FOR EARLY INTEGRATION

Ms. L. contends the trial court erred by finding continuation of her relationship with the children clearly diminished their prospects for early integration into a permanent home. We disagree.

The final of the six termination factors requires the State to prove "continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home." RCW 13.34.180(1)(f). The Department

11

can meet its burden on this element in two ways: (1) prospects for a permanent home exist but the parent-child relationship is preventing the placement, or, (2) the parent-child relationship has a damaging and destabilizing effect on the child that would negatively affect the child's placement. *In re Parental Rights to J.B.*, 197 Wn. App. 430, 438, 387 P.3d 1152 (2016). This element essentially "measures parental unfitness by examining whether the parental relationship impedes the child's welfare by diminishing its chances of entering into an enduring home." *Id.* at 439.

Here, the record establishes all four children have prospects for a permanent home, but the parent-child relationship is preventing this. First, at the time of trial, all four children were in homes approved for adoption. Second, the oldest of the four children had been with foster parents for two and one-half years, and they wanted to adopt him. Third, the Department recently placed the youngest three children in a new home with foster parents willing to adopt children, who really wanted to give the three children a chance, but it was too early in the placement process for them to commit to adopt. This evidence is sufficient for a finding that the new home was a prospective permanent home. *Dependency of K.S.C.*, 137 Wn.2d at 929 ("prospects" for permanent home does not mean certainty); *In re Dependency of A.C.*, 123 Wn. App. 244, 250, 98 P.3d 89 (2004)

12

(potential adoption).  Ms. L.'s parental relationship thus prevented the children's placement in a permanent home.

  4.  MS. L. WAS UNFIT TO PARENT

 Ms. L. contends the trial court erred by finding her unfit to parent her children. We disagree.

 Due process requires the trial court to explicitly or implicitly find by clear, cogent, and convincing evidence that the parent is currently unfit.  *Welfare of A.B.*, 168 Wn.2d at 918-19.  A trial court cannot terminate a parent's rights absent this finding of unfitness. *Id.* at 918.  Parental deficiencies alone do not render a parent currently unfit, "[t]he proper inquiry is whether the existing parental deficiencies, or other conditions, prevent the parent from providing for the child's basic health, welfare, and safety."  *In re Parental Rights to K.M.M.*, 186 Wn.2d 466, 493, 379 P.3d 75 (2016).  We address most of the trial court's challenged findings of fact here.

 *Findings of Fact 2.62.A, 2.62.B*

 Ms. L. challenges the trial court's findings of fact 2.62.A and 2.62.B that there were long periods during the dependency when she did not exercise visitation, and she missed almost 50 percent of her visits.  She does not challenge the trial court's finding

that her whereabouts were largely unknown by the Department throughout the dependency.

Ms. Gibson testified there were substantial periods of time the Department did not know where Ms. L. was. She estimated that Ms. L. only attended 50 percent of her visits. Because Ms. L. did not present any evidence to contest this, we conclude a rational trier of fact could have found these findings well supported by the evidence.

*Findings of Fact 2.62.E, 2.62.F, 2.62.H*

Ms. L challenges the trial court's findings of fact 2.62.E, 2.62.F, and 2.62.H that her visits with the children were chaotic, one venue terminated visits because of the chaotic atmosphere, and although she had improved her parenting skills, two professionals were still needed during visits.

The children visited Ms. L. twice per week when she lived at Isabella House. The visits were chaotic, and the children assaulted each other and their mother. This caused the Department to have two supervisors during visits. The visits at Caring Hearts were so chaotic that they interfered with other people visiting their children; so much so, Caring Hearts refused to continue hosting Ms. L.'s visits. Ms. Gibson testified that the visits had improved, but still two supervisors attended the visits.

14

Ms. L. did not present any contrary evidence. In fairness to her, however, Ms. Gibson attributed the chaos to the children and testified Ms. L. was doing her best.

*Finding of Fact 2.65*

Ms. L. challenges the trial court's finding of fact 2.65 that characterized her reengagement in services, just before trial, as attributable to the trial. We find this inference reasonable from the facts presented at trial.

For two and one-half years, Ms. L. most often did not engage in services. Her whereabouts were unknown for much of the time, she did not provide more than a handful of UAs, despite the requirement of four UAs per month, and she did not meaningfully engage in parenting services, mental health counseling, or trauma counseling. Two months or so before trial, she reengaged in counseling, started visiting her children, and began to provide some UAs. The trial court was free to infer this recent uptick in engagement was caused by the upcoming termination trial.

*Finding of Fact 2.88*

Ms. L. contends the trial court's finding of fact 2.88—that she cannot provide a safe and stable home for her children in the near future—was not supported by the evidence. We disagree.

15

Ms. L. does not challenge the trial court's findings that she was homeless and unemployed at the time of trial. She does not challenge the trial court's finding that she had been chronically homeless. She did not show she ever had her own housing or any employment during the entire dependency. We conclude substantial evidence supports the trial court's challenged finding.

Finally, Ms. L. contends that her homelessness, prior trauma, and unemployment were not sufficient for the trial court to find she was currently unfit to parent. We disagree—there is substantial evidence her combined deficiencies prevent her from providing for her children's health, welfare, and safety.

Despite seven stints at inpatient treatment throughout her life, Ms. L. has never overcome her substance abuse problems. She cannot demonstrate a period of sobriety. After each inpatient treatment, she has relapsed.

Ms. L. argues the Department erred in not giving her another try. But she has not completed any of her required services, largely because of her lack of sobriety. Sobriety is a difficult thing for one severely addicted to methamphetamine, marijuana, and alcohol, such as Ms. L. She is unable to control her addiction, engage, and complete necessary services. Her parental deficiencies prevent her from providing the basic health, welfare,

16

and safety that her children require. Substantial evidence supports the trial court's challenged finding.

     5.      TERMINATION OF MS. L.'S PARENTAL RIGHTS WAS IN THE BEST INTERESTS OF THE CHILDREN

Ms. L. contends that termination of her parental rights was not in the children's best interests. We disagree.

The Department showed that termination was in the children's best interests by a preponderance of the evidence. The oldest child had been in the same foster home for two and one-half years and his caregivers were ready to adopt him. The three youngest children had also been in foster care for over two and one-half years. The Department recently placed them with foster parents interested in adopting them.

Ms. Gibson testified that termination of Ms. L.'s parental rights was in the children's best interests. She explained it would take a long time for Ms. L. to remedy her parental deficiencies, her continued status as the children's mother diminished their prospect for permanent homes, and the children had been in foster care too long. The record sufficiently supports the trial court's finding that termination of Ms. L.'s parental rights was in the children's best interests.

No. 36776-2-III; No. 36777-1-III; No. 36778-9-III; No. 36779-7-III
*In re Parental Rights to J.G.A., A.A.A., E.R.A., and A.E.A.*


Affirmed.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____
Lawrence-Berrey, J.

WE CONCUR:

_____          _____
Korsmo, A.C.J.                                                    Siddoway, J.

18